**NORTHERN NATURAL GAS COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 18162.

United States Court of Appeals
Eighth Circuit.

June 30, 1966.

---

James W. R. Brown, of Fitzgerald, Brown, Leahy, McGill & Strom, Omaha, Neb., for petitioner; F. Vinson Roach and Jack C. Osborne, Omaha, Neb., and James J. Fitzgerald, Jr., of Fitzgerald, Brown, Leahy, McGill & Strom, Omaha, Neb., on the brief.

Burton G. Ross, Attorney, Tax Div., Dept. of Justice, Washington, D. C., for respondent; Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attorneys, Tax Division, Dept. of Justice, Washington, D. C., on the brief.

Before MATTHES and GIBSON, Circuit Judges, and HUNTER, District Judge.

GIBSON, Circuit Judge.

Taxpayer, Northern Natural Gas Company, (Northern) is engaged in the transmission and distribution of natural gas from points in Texas to Palmyra, Nebraska, where the system divides into two lines, one extending northwardly past Omaha, Nebraska, and Sioux City, Iowa, and then northeasterly to the Minneapolis and St. Paul, Minnesota area; the other extending northeasterly to a point northwest of Des Moines, and then northerly to the Minneapolis and St. Paul, Minnesota area.

Northern purchases gas principally in Kansas, Oklahoma, Texas and New Mexico, and transports the gas through its high pressure pipeline system, selling gas along the line in the states where purchased and in Nebraska, Iowa, Minnesota, and South Dakota.

In order to operate a more efficient system by having a ready source of supply of gas in the winter months to satisfy the demands in the northern states of Nebraska, Minnesota, and South Dakota, Northern constructed and acquired a huge underground storage facility at Redfield, Iowa, in the Des Moines, Iowa, area, wherein they would store gas in the slack summer season, thus making more efficient utilization of their extensive pipeline system that reached into the producing areas and at the same time provided them with additional gas needed in the winter months to supply their customers. The gas purchased by them was from a number of original supply sources, among which suppliers was Permian Basin Pipe Line Company (Permian), a related operation in which Northern owned 83.7 per cent of Permian's common stock. The stock acquisition in Permian commenced in 1952 before Permian had a pipeline system. Northern, prior to 1955, had acquired a controlling interest in Permian and had underwritten the construction of Permian's pipeline facilities and in effect provided the equity financing for Permian along with other operating loans and assistance. When constructed, the Permian line connected with Northern's line and Northern received almost all of the gas purchased by Permian for transmission in its lines. There was some gas sold enroute by Permian and the amount received therefor credited on its overall operations which were underwritten and guaranteed by Northern under contract approved by the Federal Power Commission. A considerable amount of the gas purchased by Northern from Permian was placed in its large underground storage facility at Redfield, Iowa.

Northern and Permian are subject to regulation by the Federal Power Commission. The Commission determined that Permian was an operating subsidiary of Northern, that for the purpose of fixing rates Permian's pipeline should be treated as Northern's operation, and decreed that Northern and Permian must operate under a "cost of service tariff" arrangement. This arrangement required Northern to pay Permian for the costs incurred in the operation of its line (which necessarily included, (1) the purchase price of the gas from the supplier, and (2) the expenses of transportation through the Permian system) plus a payment of 6 per cent on Permian's net investment.[1]

In calculating its taxable income for 1955 Northern asserted that "the operation of the Permian system was in fact and substance petitioner's operation." It, therefore, computed the cost of its gas inventory on the basis of the amount paid by Permian to the original suppliers of the gas, thus charging the various expenses of Permian in transporting the gas through its system as a current operating expense of Northern.

---

1. Originally Permian had filed a fixed price tariff for its gas but this was disallowed because of its subsidiary status with Northern, its chief purchaser. The Power Commission did find that Permian's operation was in fact Northern's operation because of it being an affiliated corporate operation in which Northern owned over 80 per cent of the common stock of Permian.

Interpreting § 471 of the Internal Revenue Code of 1954 [2] and § 1.471–3 of the Treasury Regulations [3] the Commissioner did not agree with Northern's conclusion. In the Commissioner's view, "Permian was not the taxpayer's agent nor did it act on behalf of taxpayer. * * * The relationship between taxpayer and Permian was as buyer and seller." Accordingly, the Commissioner ruled that the value of Northern's inventory must be computed on the basis of the price paid to Permian, and not the amount paid by Permian to the supplier. Therefore, Northern was ruled to have incorrectly deducted as current operating expenses the various transportation expenses incurred by Permian. On this basis the Commissioner assessed a $33,145.18 deficiency against the taxpayer.[4] Following a timely petition this case was heard before the Tax Court. The Tax Court upheld the Commissioner in part holding that the gas received from Permian should be included in inventory at the amount paid by Northern to Permian on the "cost of service tariff" and not the amount Permian paid to its suppliers for the gas. The Court stated that " * * Permian was operated as a separate entity * * * [and] Permian's separate

entity must be preserved." 44 T.C. 74. Taxpayer is unhappy with this result and has petitioned this Court for a review of the Tax Court's decision on this point.

The ultimate issue to be resolved is this: Can the expenses incurred by Permian in the transportation of the gas and the amount of 6 per cent return on Permian's investment be deducted as current operating expenses of Northern Natural Gas?

No one denies that Permian is a separate entity in the eyes of the law and is taxable as such. Moline Properties v. Commissioner of Internal Revenue, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). Northern admits this and is not contending that Permian's separate entity should be ignored but contends the operation of Permian's system was in fact Northern's operation and that its payments to Permian represent reimbursement for Permian's expenditures. Therefore, since Northern had to bear the ultimate expense, it argues for the adoption of a blanket rule stating that, "The party required to bear the ultimate burden of a cost is the one entitled to a deduction." We agree that this statement has wide application, especially when applied to situations of established princi-

---

2. § 471

"Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

3. "§ 1.471–3 Inventories at cost

"Cost means:

"(b) In the case of merchandise purchased since the beginning of the taxable year, the invoice price less trade or other discounts * * *. *To this net invoice price should be added transportation or other necessary charges incurred in acquiring possession of the goods.*" (Emphasis added.)

4. The Commissioner originally contended that Northern had understated its in-

ventory of stored gas by $63,740.73 and overstated its operating deductions by a like amount. The deductions in question consisted of the operating expense of transmitting the gas from the points of purchase through Northern's and Permian's pipelines to the storage facilities at Redfield, Iowa. The Tax Court held that the costs incurred by Northern in transporting gas through its own pipeline was currently deductible as an operating expense as Northern had acquired possession of the gas at the time it was received from the supplier and hence costs of transmission incurred from that point on could be expensed. Commissioner had argued for a different meaning of the phrase "acquiring possession", contending that phrase denoted a continuing process that was not completed until the gas reached the storage area. This concept was rejected by the Tax Court and the Commissioner did not appeal from that decision, thus leaving as a related issue the proper treatment of Permian's transmission costs.

pal-agent or employer-employee relationships. However, we do not believe this blanket pronouncement can be given universal application in all factual contexts. Applied to the facts of this case and related situations, independent buyers and sellers could contract on a cost plus fixed amount basis, thus effectively shifting the "burden of cost" and thereby avoid separate entity taxation. Or, for that matter, in all sale transactions it is the purchaser that is "required to bear the ultimate burden of a cost". Certainly taxpayer cannot seriously be contending that all purchasers may deduct the costs incurred by the seller. Such a rule would completely disrupt our present theory of taxation and make effective administration extremely difficult. We do not think such a result was envisioned by the drafters of our revenue law, nor called for by a proper application of that law.

Obviously, something more is required to shift the burden of expenditures between entities than bearing "the ultimate burden of a cost". It is our opinion that this something more is an agency relationship between the entities. Northern does not flatly contend that Permian is its agent but rather that Permian's operation was in substance and in fact Northern's operation, since it received the profit from and was required to bear all of the costs and losses of the operation of Permian's transmission system. It also asserts that the payments made by Northern to Permian on the "cost of service tariff" were reimbursements to Permian for the cost of capital invested or else compensation for the use of the pipeline facilities furnished as lessor, Northern being the lessee and operator of the leased system. There was, of course, no lease executed, this merely being an analogy advanced by Northern. However, the basic fact remains that Permian was a separate corporation, that it received its permission to operate as a separate corporation, that its books and records were separately kept, that it was financed as a separate entity, and that it was taxable as a separate entity. Northern, the parent corporation, chose this corporate method of operation and must accept the legal consequences. Only if Permian were acting and incurring these expenses on behalf of Northern as an agent will Northern be permitted to treat these expenses as its own. National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949). The ultimate issue in this case will, therefore, be resolved by determining if Permian were acting on Northern's behalf or as Northern's agent when it purchased the gas from the supplier and transported the gas to Northern's system.

The burden of proving that Permian was acting as an agent is upon Northern. When conflicting inferences can be drawn from the evidence, the decision that no agency relationship existed is for the Tax Court. Greer v. Commissioner of Internal Revenue, 334 F.2d 20 (5 Cir. 1964). Its decision on this question is a finding of fact which will not be disturbed unless the finding was clearly erroneous. Omaha Nat. Bank v. Commissioner of Internal Revenue, 183 F.2d 899 (8 Cir. 1950), 26 U.S.C.A. § 7482(a).

In viewing this question there are a large number of factual references indicating that no agency relationship was involved and that Permian was at all times acting on its own behalf. Thus, Northern is not entitled to claim Permian's expenditures as its own.

Permian purchased the gas in its own name and not in the name of Northern. Consequently, it appears as though it was Permian and not Northern that had legal title to the gas. Permian was theoretically free to dispose of the gas as it saw fit. At this point the inference may fairly be drawn that Permian was operating independently of Northern.

When it came to disposing of the gas, both Northern and Permian recognized the essential nature of their relationship. In the "Service Agreement" between the two corporations, Permian was denominated as the "seller" of the gas and Northern as the "buyer". As the Commissioner recognized, this certainly does not sound as if Permian were serving as Northern's agent. Rather, it clearly indi-

cates that Permian was acting as an independent merchant, selling gas which it purchased in its own name from a third party.

Though financed by Northern, Permian constructed its own pipeline and maintains independent ownership of its assets. It independently hires a number of individuals who maintain and operate these assets. Permian maintains its accounting entity, and when it sells the gas to Northern the accounts are credited according to standard accounting practice. It has independently entered contracts, borrowed money, executed notes, and repaid the money with interest as agreed. Northern and Permian file separate reports to the Federal Power Commission and they maintain separate corporate structures. It has been held that the separate corporate activities of an alleged agent tend to refute the existence of a continuing and complete agency relationship. Given v. Commissioner of Internal Revenue, 238 F.2d 579 (8 Cir. 1956). As stated in Moline Properties v. Commissioner of Internal Revenue, supra, 319 U.S. at pages 440–441, 63 S.Ct. at page 1135, " * * * [T]he question of agency or not depends upon the same legal issues as does the question of identity * * *."

Finally, there is no written documentation of an agency relationship. In determining whether a corporation was acting as an agent for one of its stockholders for the purpose of taxation, the courts have placed heavy emphasis on the absence of written evidence of the claimed relationship. Its absence tends to indicate none existed. Given v. Commissioner, supra; Greer v. Commissioner, supra.

Therefore, as observed by the Federal Power Commission, "[Permian] will be engaged in the transportation and sale of natural gas." Consequently, Permian was not in the business of serving as an agent for Northern. Therefore, profit received by Permian was derived from the operation of its natural gas transportation business, and expenses incurred in operating this business are attributable to Permian and deductible by it.

Northern cannot claim them. The legal conclusion of the Tax Court is correct and its factual determination is fully supported by the record.

Northern, however, has placed great emphasis on the ruling of the Federal Power Commission that the Permian pipeline should be treated as Northern's operation. We do not believe this ruling of the Power Commission in any way changes the essential nature of the relationship between Northern and Permian. The Power Commission decreed no changes in the established relationship. It only viewed the situation as it existed at the time and decreed what rate would be proper under the circumstances. In fact, the Commission report specifically recognized that Permian was "engaged in the transportation and sale of gas * * as an operating subsidiary." Further, it clearly recognized that the transactions between Northern and Permian were sales and, therefore, not merely deliveries by an agent. The Commission report confirmed the buyer-seller relationship. It did not change it.

■ Northern further intimates that the finding of the Federal Power Commission holding Permian's pipeline was Northern's operation estops us from finding that no agency relationship existed between Northern and Permian. We do not believe that it does. The report of the Power Commission does not use these words as words of art or in the context of the taxing law. The statement is certainly ambiguous in that it does not necessarily mean that a pure agency relationship exists. It could just as well be, and probably was, referring to the recognized fact that Permian was an operating subsidiary of Northern. We do not feel, therefore, that this one observation made during, and for the purpose of, rate determination should be broadly construed and binding upon the government on the question of taxing the separate corporate entities.

Northern also seems to believe that there is some magic in the establishment of a rate requiring payment of costs plus

a fixed return which mysteriously changes the basic nature of the parties' independent relationship. This is not so. When two corporations act as buyer and seller, the price charged for the sale of the property or product, whether set by mutual agreement or by government decree, has no effect on the essential nature of the transaction. The transaction is still a sale. The buyer-seller relationship remains the same regardless of the price paid. Northern is free to purchase other gas but must honor its service agreement with Permian for Permian's gas and pay the price set by the Federal Power Commission. A fixed tariff could have been approved, but it was not because of the interlocking and parent and subsidiary relationship of the entities. Just because the close corporate relationship requires the price to be tied to Permian's expenses, it does not transform a clear sale by a recognized corporate entity into a mere delivery by an agent. As stated earlier, the establishment of a cost plus price between a buyer and seller will not in itself allow the purchaser to deduct the seller's various costs. Northern relies on Glendinning, McLeish & Co., Inc. v. Commissioner of Internal Revenue, 61 F.2d 950 (2 Cir. 1932) and Patchen v. Commissioner, 27 T.C. 592, which correctly state the principle that expenses incurred by a taxpayer on behalf of another cannot be deducted by the taxpayer if the other party reimburses taxpayer for the expenditures, since the expensed items were not true expenses of the taxpayer, i. e., an agent making repairs on a building for which he is reimbursed by his principal are obviously deductible expenses of the principal and not the agent. Here Permian owned the pipeline and transmitted the gas and the expenses of such transmission were Permian's expenses, although it did receive reimbursement from Northern.

If Permian incurred these expenses of transmission on behalf of Northern, Permian could not deduct these expenses. Permian did deduct these expenses as proper operating expenses of its own system and filed its separate tax return accordingly. These expenses cannot be deducted by Northern because its payment to Permian was at a price required in the operation of Northern's business. This is the cost basis of the gas Northern received from Permian and must be included in the inventory at the purchase price. When the gas is sold this purchase figure is used in determining gain or loss.

As a final note, were we to accept Northern's position and allow affiliated corporations, like Northern, to easily shift inventory costs and operating expenses, it would be receiving the benefits now conferred only upon those who file a consolidated return as provided by § 1.-1502 et seq. of the Income Tax Regulations. Northern would be receiving the benefit of a consolidated return without the attendant penalties. It is our opinion that if Northern desires to avoid the effects of the entities that it maintains, it should file a consolidated return or amalgamate the entities. We do not believe the taxpayer should be allowed to operate separate corporate entities and then ignore these entities when it is to its advantage to do so for accounting or tax purposes.

■■ It is our conclusion that there is substantial evidence to support the Tax Court's finding that Permian was acting independently of Northern. Therefore, Northern is not entitled to deduct as current operating expenses, the expenditures of Permian. Northern's inventory must be based upon the sale price paid by it to Permian. The Commissioner's assessment against taxpayer on this issue is correct. The decision of the Tax Court is affirmed.